**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**

**Grand Jury Sworn in on May 16, 2011**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| **v.** | : | **VIOLATIONS:** |
| **DAVID LEVICK** | : | **18 U.S.C. § 371 (Conspiracy)** |
| **and** | : | |
| **ICM COMPONENTS, INC.,** | : | **50 U.S.C. § 1705 (International Emergency Economic Powers Act)** |
| **Defendants.** | : | **31 C.F.R. Part 560 (Iranian Transactions Regulations)** |
| | : | **22 U.S.C. § 2778 (Arms Export Control Act)** |
| | : | **22 C.F.R. Parts 120-130 (International Traffic in Arms Regulations)** |
| | : | **18 U.S.C. § 2 (Aiding and Abetting)** |
| | : | **28 U.S.C. § 2461(c) (Criminal Forfeiture)** |

**INDICTMENT**

The Grand Jury charges that:

**COUNT ONE**
**(Conspiracy)**

At all times material to this Indictment:

# INTRODUCTION

1. Companies based in the United States were among the world-wide leaders in manufacturing aircraft parts for military and civilian uses. Beginning in 1995, the United States imposed a range of trade restrictions on the Islamic Republic of Iran. As described further below, those restrictions had the effect of preventing anyone in Iran – or any persons outside the United States acting on their behalf – from purchasing virtually any U.S. origin goods without the specific permission of the U.S. government.

2. Defendant DAVID LEVICK ("LEVICK"), was an Australian national who was the general manager of ICM COMPONENTS, INC., located in Thornleigh, Australia.

3. Defendant ICM COMPONENTS, INC. ("ICM") was an Australian company located in Thornleigh, Australia, that, among other things, procured aircraft parts and other goods from the United States on behalf of Iranian A. Defendant LEVICK at all times acted on behalf of ICM.

4. Iranian A was a representative of Company A, a trading company in the Islamic Republic of Iran. Iranian A also operated and controlled companies in Malaysia that acted as intermediaries for Company A.

## A. The International Emergency Economic Powers Act and the Iranian Transactions Regulations

5. The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States when the President declared a national emergency with

respect to that threat.

6. On March 15, 1995, the President issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat." Executive Order No. 12957, as expanded and continued by Executive Orders Nos. 12959 and 13059, was in effect at all times relevant to this Indictment.

7. Executive Orders Nos. 12959 and 13059 (collectively with Executive Order No. 12957, "Executive Orders") imposed economic sanctions, including a trade embargo, on Iran. The Executive Orders prohibited among other things the exportation, reexportation, sale, or supply directly or indirectly to Iran of any goods, technology, or services from the United States or by a United States person. The Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

8. The Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations ("ITR"), 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

9. The ITR prohibited among other things the export, reexport, sale, or supply, directly or indirectly, of any goods, technology, or services from the United States or by a United

States person, wherever located, to Iran or the Government of Iran, without prior authorization or license from the United States Department of the Treasury, through the Office of Foreign Assets Control, located in the District of Columbia. These regulations further prohibited any transactions that evaded or avoided or had the purpose of evading or avoiding any of the prohibitions contained in the ITR, including the unauthorized exportation of goods from the United States to a third country if the goods were intended or destined for Iran.

10. On or about October 15, 2007, IEEPA was amended to also apply to any person or entity who willfully conspired to violate, or caused a violation of, the ITR.

11. The IEEPA, the Executive Orders, and the ITR were in effect at all times relevant to this Indictment.

12. At no time did defendants LEVICK or ICM or their conspirators apply for, receive, or possess a license or authorization from the Office of Foreign Assets Control to export goods, technology, or services of any description to Iran.

**B. The Arms Export Control Act and the International Traffic in Arms Regulations**

13. The Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, and the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120-130, governed the export of certain items and services from the United States. The AECA authorized the President to control the export of "defense articles" by designating items, such as certain military aircraft components, on the United States Munitions List ("Munitions List"), which was codified at 22 C.F.R. § 121.

14. The AECA and its attendant regulations, the ITAR, required a person to apply for and obtain an export license from the United States Department of State, Directorate of Defense

Trade Controls ("DDTC"), located in the District of Columbia, before exporting arms, ammunition, or articles of war (which were all classified as defense articles under 22 U.S.C. §§ 2778(b)(2) and 2794(3), and 22 C.F.R. § 120.1) from the United States. The DDTC required the exporter to state in any application for an export license, among other things, the nature of the armaments to be exported, the end recipient of the armaments, and the purpose for which the armaments were intended. This type of information assisted the government in determining whether the export of the armaments would further the security and foreign policy interests of the United States or would otherwise affect world peace.

15. It was the policy of the United States to deny licenses with respect to the export of defense articles whenever an export would not be in furtherance of world peace and the security and foreign policy interests of the United States.

16. The AECA and ITAR were in effect at all times relevant to this Indictment.

17. At no time did defendants LEVICK or ICM or their conspirators apply for, receive, or possess a license to export defense articles to Iran or any other foreign destination.

**THE CONSPIRACY**

18. Beginning as early as in or about March 2007, the exact date being unknown to the Grand Jury, and continuing through in or around March 15, 2009, in the District of Columbia and elsewhere, defendants LEVICK and ICM did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the Grand Jury, to commit offenses against the United States and to defraud the United States, more particularly:

(a) to violate IEEPA by exporting and causing to be exported, and attempting to export and to cause to be exported,

aircraft parts and other goods to Iran without having first obtained the required license or authorization from OFAC located in the District of Columbia;

(b) to violate AECA by exporting and causing to be exported, and attempting to export and to cause to be exported, defense articles from the United States which were designated on the Munitions List without first obtaining from the United States Department of State, DDTC, a license or written authorization for such an export; and

(c) to defraud the United States by obstructing, hampering, hindering, frustrating, defeating, impairing, and impeding the Department of the Treasury, the Department of State, and the United States government in the exercise of a lawful government function, that is, the enforcement of laws and regulations prohibiting the export or supply of defense articles and goods and services from the United States to Iran, by craft, trickery, deceit, and dishonest means.

## A. <u>Manner and Means of the Conspiracy</u>

19. The manner and means by which the defendants and their conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

A. Defendants LEVICK and ICM solicited purchase orders and business from Iranian A for U.S.-origin aircraft parts and other goods.

B. Defendants LEVICK and ICM then placed orders with U.S. companies on behalf of Iranian A for aircraft parts and other goods that Iranian A could not have directly purchased from the United States without the permission of the U.S. government. These items included the following five types of goods manufactured in the United States (collectively "Restricted Goods"):

(1) **VG-34 Series Miniature Vertical Gyroscopes** ("Gyroscopes") were manufactured by a company located in Minnesota, and distributed by a company located in Wisconsin (hereinafter "Wisconsin distributor"). Gyroscopes were aerospace products used to measure precisely and/or maintain control of pitch and roll in applications such as helicopter flight systems, target drones, missiles, torpedoes, and remotely piloted vehicles. The DDTC has determined that VG-34 Miniature Vertical Gyroscopes were defense articles under Category VIII(e) of the Munitions List.

(2) **K2000 Series Servo Actuators** ("Servo Actuators") were manufactured by a company in North Carolina (hereinafter "North Carolina company"). Servo Actuators were designed for use on aircraft. The standard Servo Actuator was designed to be used for throttle, nose wheel steering, and most flight control surfaces. High-torque Servo Actuators were designed to be used for providing higher torque levels for applications such as flaps and landing gear retraction. The DDTC has determined that K2000 Series Servo Actuators were defense articles under Category VIII(h) of the Munitions List.

(3) **Precision Pressure Transducers, Part Number PPT0001DWW2C** ("Precision Pressure Transducers") were manufactured by a company located in Minnesota ("Minnesota company"). Precision Pressure Transducers were sensor devices that have a wide variety of applications in the avionics industry, among others, and can be used for altitude measurements, laboratory testing, measuring instrumentations, and recording barometric pressure.

(4) **Emergency Floatation System Kit, Part Number 206-385-103** ("Float Kit") was manufactured by a company in Florida and contained a landing gear, float bags, composite cylinder and a complete electrical installation kit. Such Float Kits were designed for use on Bell 206 helicopters to assist the helicopter when landing in either water or soft desert terrain.

(5) **Shock Mounted Light Assembly, Part Number 151-0005** ("Light Assemblies") were packages of lights and mounting

equipment designed for high vibration use and which can be used on helicopters and other fixed wing aircraft.

C. When necessary, defendants LEVICK and ICM used a broker in Tarpon Springs, Florida ("Florida broker"), through whom orders could be placed for the Restricted Goods to further conceal the fact that the Restricted Goods were intended for transshipment to Iranian A in Iran.

D. Defendants LEVICK and ICM intentionally concealed the ultimate end-use and end-users of the Restricted Goods from manufacturers, distributors, shippers, and freight forwarders located in the United States and elsewhere as well as from U.S. Customs and Border Protection ("CBP").

E. To further conceal their conspiracy, defendants LEVICK, ICM, and other members of the conspiracy structured their payments between each other for the Restricted Goods to avoid trade restrictions imposed on Iranian financial institutions by other countries.

F. Defendants LEVICK and ICM wired money to companies located in the United States as payment for the Restricted Goods.

G. Defendants LEVICK, ICM, and other members of the conspiracy never obtained the appropriate licenses from OFAC and the DDTC for the export of the Restricted Goods to Iran.

**B. <u>Overt Acts</u>**

20. Beginning outside of the jurisdiction of any particular State or district, and later within the District of Columbia and elsewhere, in furtherance of the above-described conspiracy and in order to carry out the object thereof, defendants LEVICK, ICM, and others known and

unknown to the Grand Jury committed the following overt acts and caused them to be committed, among others:

(1) On or about March 11, 2007, Iranian A requested from defendant LEVICK a quotation for light assemblies that could be used on helicopters and aircraft.

(2) On or about March 27, 2007, defendant LEVICK proposed to Iranian A two alternative products along with pricing information, one of which was for a Shock Mounted Light Assembly, Part Number 151-0005 ("Light Assemblies") supplied by a company in New York (hereinafter "New York company").

(3) On or about April 7, 2007, Iranian A accepted defendant LEVICK's proposal and placed and order for ten Light Assemblies at a price of $185.00 a piece.

(4) On or about April 11, 2007, defendant LEVICK provided Iranian A with a pro forma invoice for the ten Light Assemblies at $185.00 each; although the parts would be invoiced to the Iranian trading company, they were to be shipped to a company in Malaysia; the total cost with shipping to Malaysia and bank charges was listed as 1,990.00 euros.

(5) On or about May 1, 2007, Iranian A wrote to defendant LEVICK, "Today I have send [sic] to your account the amount of EUR 1519.00 for this order. Please proceed and ship them to [a Malaysian company] as soon as possible."

(6) On or about May 3, 2007, Iranian A contacted defendant LEVICK seeking thirty Servo Actuators.

(7) On or about May 10, 2007, Iranian A revised the order to fifteen standard torque and six high-torque actuators, for a total of twenty-one Servo Actuators.

(8) On or about May 14, 2007, defendant LEVICK made a wire payment from

his Australian bank account to his Florida broker in the amount of $23,557.50; of that amount, only $1,500 was intended as payment for the ten Light Assemblies.

(9) On about June 1, 2007, defendant LEVICK contacted Iranian A with a price quote for the Servo Actuators.

(10) On or about June 7, 2007, Iranian A contacted defendant LEVICK and requested a quotation for thirty-two Gyroscopes.

(11) On or about June 27, 2007, defendant LEVICK caused his Florida broker to ship ten Light Assemblies to defendant ICM in Thornleigh, Australia; the Florida broker's commercial invoice noted the following with regard to the Light Assemblies: "Country of Export: USA," "Country of Manufacture: USA," and "Country of Ultimate Destination: Australia."

(12) On or about June 28, 2007, defendant LEVICK and ICM issued pro forma invoice number 03339 for the Servo Actuators to the Iranian trading company which listed a ship-to address of the company in Malaysia; the total amount of the invoice including shipping to Malaysia and bank charges, was 40,617.20 euros.

(13) During July and September 2007, defendant LEVICK negotiated pricing and banking terms for the Gyroscopes with the Iranian trading company.

(14) On or about July 11, 2007, Iranian A wrote to LEVICK advising LEVICK as follows: "As [the Gyroscope manufacturer] may ask for an end-user please make sure that you will get the gyros prior to proceeding with payments etc."

(15) On or about August 10, 2007, defendant LEVICK made a wire payment from defendant ICM's bank account in Australia to his Florida broker's account in the United

States in the amount of $27,967.63 as partial payment for the Servo Actuators.

(16) On or about August 19, 2007, Iranian A contacted defendant LEVICK and told him that the Light Assemblies his Iranian end-user had received were the wrong parts, even though the outside of the package was identified as containing the correct Light Assemblies.

(17) On or about September 1, 2007, Iranian A accepted new payment terms for the Gyroscopes and informed defendant LEVICK that he would arrange for the payment of 59,887.50 euro to defendant ICM, which constituted 25% down payment for the Gyroscopes order.

(18) On or about September 10, 2007, Iranian A contacted defendant LEVICK and requested quotes on six items, one of which was a Float Kit.

(19) In response to Iranian A's request, on or about September 18, 2007, defendant LEVICK provided Iranian A with a price quote of 54,025 euros for the Float Kit with a shipping cost of US$6,000.

(20) On or about September 19, 2007, Iranian A requested that defendant LEVICK provide his "best price" for the Float Kit.

(21) In response, defendant LEVICK quoted Iranian A prices of 53,500 euros and later 45,100 euros for the float kit.

(22) On or about September 28, 2007, defendant LEVICK wired $30,604.28 from ICM's Australian bank account to the U.S. bank account of his Florida broker as partial payment for the Gyroscopes.

(23) On or about October 15, 2007, Iranian A accepted defendant LEVICK's

quoted price of 45,100 euros for the Float Kit and requested a pro forma invoice from defendant ICM.

(24) On or about October 16, 2007, defendant LEVICK provided Iranian A a pro forma invoice for the Float Kit which stated that the Float Kit would be paid for by the Iranian trading company but was to be shipped to a company in Malaysia; payment would be made to LEVICK's Australian bank account.

(25) On or about November 3, 2007, Iranian A informed defendant LEVICK that the Iranian end-user was going to ship the Light Assemblies back to LEVICK and asked whether LEVICK would prefer the Iranian end-user send the Light Assemblies to LEVICK from Tehran, Iran, or through a company in Malaysia.

(26) On or about November 5, 2007, defendant LEVICK informed Iranian A that the Light Assemblies should be sent from Tehran, Iran, because it would be quicker.

(27) On or about November 5, 2007, defendant LEVICK wired $50,075.00 from ICM's Australian bank account to the U.S. bank account of his Florida broker as further payment for the Gyroscopes.

(28) On or about November 8, 2007, defendant LEVICK received an invoice from the Florida broker for three parts, including one Float Kit at a cost of $56,400.00.

(29) On or about November 12, 2007, the Florida broker, acting at the direction of defendant LEVICK, placed an order with a Florida company for one Float Kit at a unit price of $57,695.00.

(30) On or about November 16, 2007, Iranian A instructed defendant LEVICK to follow certain shipping instructions when placing orders on behalf of Iranian A:

> Please write [company in Malaysia] as ship to address but notify the forwarder address below as they will check the goods on behalf of [the company in Malaysia] at customs KL [Kuala Lumpur] and ship to Tehran at the same time without bringing them out of the KL's costums [sic].

(31) On or about November 16, 2007, defendant LEVICK acknowledged and agreed to Iranian A's shipping instructions for all goods ordered by the Iranian trading company.

(32) On or about November 16, 2007, defendant LEVICK wired from his Australian bank account to the bank account of the Florida broker $67,023.00 for payment of the Float Kit.

(33) On or about November 19, 2007, defendant LEVICK caused the Florida broker to wire $38,100.00 to the Wisconsin company as partial payment for the Gyroscopes.

(34) On or about November 19, 2007, the Iranian end-user sent a shipment of the Light Assemblies via DHL from Tehran, Iran, to defendant LEVICK; the Iranian end-user listed on the air waybill was located in Tehran, Iran.

(35) On or about November 23, 2007, Iranian A contacted defendant LEVICK and requested that LEVICK purchase five Precision Pressure Transducers from a Minnesota company.

(36) On or about November 23, 2007, defendant LEVICK wrote to Iranian A as follows:

> The quickest I can get these [Precision Pressure Transducers] is 4-6 weeks from order [at the unit price of] E$827.00 [euros]. These parts are from the Australia Disturber [sic]. [The U.S. manufacturer] will not sell outside the U.S

(37) On or about November 25, 2007, Iranian A accepted defendant LEVICK's

quote for the Precision Pressure Transducers with instructions to "order rightaway [sic]" and send them to [a Malaysian company] c/o [a Malaysian freight forwarder]."

(38) On or about November 25, 2007, Iranian A contacted defendant LEVICK and instructed LEVICK as follows:

> While sending our goods to [Malaysian company] and notifying [Malaysian freight forwarder] please inform me immediately sothat [sic] I can arrange with [the freight forwarder] for smooth transshipments.

(39) On or about November 28, 2007, Iranian A contacted defendant LEVICK stating that he had wired payment for the Precision Pressure Transducers to LEVICK and requested that LEVICK shorten the delivery time.

(40) On or about November 30, 2007, defendant LEVICK caused the Minnesota company's Australian-based distributor to falsely inform a representative of the Minnesota company that the Precision Pressure Transducers were for use in unmanned helicopters that survey rural Australia.

(41) On or about December 20, 2007, defendant LEVICK caused the Minnesota company to ship the Precision Pressure Transducers from the United States to its Australian-based distributor.

(42) On or about December 21, 2007, defendant LEVICK represented to the Florida broker that the Float Kit was for use on Bell 206 helicopters by BHP Billion, a mining company in Australia, for use in either Malaysia or Papua, New Guinea.

(43) On or about December 31, 2007, Iranian A notified defendant LEVICK that Iranian A had not yet received the Precision Pressure Transducers and asked, "Please keep

[me] informed when would you release them to KL [Kuala Lumpur] or if possible directly to Iran."

(44) On or about January 9, 2008, defendant LEVICK provided an invoice for the Precision Pressure Transducers to Iranian A and informed Iranian A that the parts would be shipped that day to a Malaysian company.

(45) On or about January 14, 2008, defendant LEVICK caused the Florida broker to make a wire payment of $25,000.00 to the manufacturer in partial payment for the Float Kit.

(46) On or about March 10, 2008, Iranian A informed defendant LEVICK that Iranian A's bank in Iran was no longer working with a bank in Australia; that LEVICK should check with LEVICK's bank in Australia to see if LEVICK's bank worked with other Iranian banks; and that if necessary Iranian A could pay LEVICK from Malaysia.

(47) On or about March 10, 2008, defendant LEVICK advised Iranian A to send payment through Malaysia:

> I have just been informed that the U.S have [sic] put more restriction[s] on the mo[ve]ment of funds from Iran. The ANZ bank close[d] its funds transfers contract with Iran at the end of last month. So you will have to do it from Malaysia next month. Will keep you posted[.] Bloody yanks.

(48) On or about March 17, 2008, defendant LEVICK caused his Florida broker to ship another ten Light Assemblies to LEVICK; the Florida broker's commercial invoice noted the following with regard to the Light Assemblies: "Country of Export: USA," "Country of Manufacture: USA," and "Country of Ultimate Destination: Australia.."

(49) On or about March 19, 2008, defendant LEVICK caused the Florida

broker to make a wire payment of $24,000.00 to the Fort Lauderdale, Florida, company in payment for the Float Kit.

(50) On or about April 1, 2008, following a delay in the shipment of the Gyroscopes, defendant LEVICK wrote to Iranian A as follows:

> The [Gyroscopes–] Will ask [the manufacturer] for a refund due to the long delay.
>
> [Iranian A . . . ] I have always tried my best to get the parts & del[iver to] you [as] required but sometime the U.S & Australian supplier have to get the parts from the Manufactor [sic] which may not be stock at the time I place the order with them. As U know there are restriction on Iran & I have to do my best to get the parts. I hope to clean up this mess asap.

(51) On or about June 19, 2008, defendant LEVICK provided to Iranian A a copy of the air waybill for the export of the Float Kit from the United States to the company in Malaysia.

(52) On or about June 24, 2008, defendant LEVICK caused a U.S.-based freight forwarder to export the Float Kit from the United States to the company in Malaysia.

(53) On or about June 25, 2008, Iranian A informed defendant LEVICKthat his Iranian customer was prepared to pay LEVICK extra money if LEVICK provided a false end-user to the manufacturer of the Float Kit.

(54) On or about June 26, 2008, defendant LEVICK contacted Iranian A to recommend that any payments from Iranian A come through Malaysia:

> Don't send the funds from Iran as the banks in Australia will not prosses [sic] the t/t [funds transfer]. Make payments from Malaysia?? I have been get[ting] some questions about some of the stuff I have been sending so I do[n']t want to draw attation [sic] to it. As for shipping I think it was the last lot I sent to Iran that the questions start getting asked.

(55) On or about June 29, 2008, Iranian A contacted defendant LEVICK and indicated that he was "looking for an end-user name" for the Gyroscopes in response to the manufacturer's request for end-user information and an export license.

(56) On or about July 12, 2008, Iranian A contacted defendant LEVICK and indicated that Iranian A had asked a false end-user in Armenia to contact defendant LEVICK directly; Iranian A further advised defendant LEVICK that the Armenian individual would provide him with all the necessary documents he needed to obtain the Gyroscopes.

(57) On or about August 21, 2008, defendant LEVICK informed Iranian A that the Float Kit was still being detained by CBP and that LEVICK was going to attempt to determine why it had not shipped yet.

(58) On or about August 28, 2008, defendant LEVICK asked Iranian A whether LEVICK should provide a new false end-user to the Florida broker and United States authorities in order to facilitate the shipment of the Float Kit: "Do you want me to give Mr. Tavakoli as the end user[?]"

(59) On or about September 14, 2008, defendant LEVICK wrote to Iranian A as follows:

> I am sending you this email to let you know that the [Australian government] & the U.S. customs know about what parts I have supplied to you as I have had a visit from both. I was questioned over the weekend about the business we have done & everything

> has been taken. Computers, Bank accounts & all paperwork that has to do with the parts supplied & emails are being monitored so this is [] a new email address So I could advise you of what it happing [sic] & while [sic] you have had no replies from me as I could face charges & fine for breaking trade rules & 5y in jail. My U.S. supplier had a visit as well last week & could be facing the same. [The Australian authorities] have been watching [Malaysian company] for a while & it may be visited next. All the funds you sent for parts where [sic] sent to my U.S. supplier as this was the only way I could get the parts for you as ICM could not finance them for you by my self [sic]. If it helps I can give you my U.S supplier email address so you can ask for your self what is going on with the shipments [sic].

(60) On or about September 15, 2008, Iranian A responded to defendant LEVICK and requested the contact information of the Florida broker in order to obtain delivery of the pending shipments of U.S. origin goods or to have his money refunded.

(61) On or about September 17, 2008, Iranian A sent an e-mail message to the Florida broker with a copy to defendant LEVICK in which Iranian A requested a refund of the money paid to the Florida broker for the Servo Actuators, the Gyroscopes, the Float Kit and other items that he been ordered through the Florida broker.

(**Conspiracy**, in violation of Title 18, United States Code, Section 371.)

## COUNTS TWO THROUGH FIVE

21. The allegations in Paragraphs 1 through 20 are incorporated and re-alleged by reference in this Count.

22. On or about the dates listed as to each count below, in the District of Columbia, and elsewhere, defendants LEVICK and ICM did knowingly and willfully violate the embargo against Iran by exporting and causing to export aircraft parts and other goods, and attempting to

export and causing to be exported aircraft parts and other goods described more fully below from the United States to Iran without having first obtained the required authorizations from the Office of Foreign Assets Control, United States Department of the Treasury, located in the District of Columbia:

| COUNT | APPROXIMATE DATE | PART & PART NUMBER | OVERT ACT |
|---|---|---|---|
| TWO | June 27, 2007 | Ten (10) Shock Mounted Light Assemblies; Part Number 151-0005 | 11 |
| THREE | December 20, 2007 | Five (5) Precision Pressure Transducers; Part Number PPT0001DWW2C | 42 |
| FOUR | March 17, 2008 | Ten (10) Shock Mounted Light Assemblies; Part Number 151-0005 | 49 |
| FIVE | June 24, 2008 | One (1) Emergency Floatation System Kit; Part Number 206-385-104 | 53 |

**(Exports and Attempted Exports to Embargoed Country**, in violation of Title 50, United States Code, Sections 1702 and 1705; Title 31, Code of Federal Regulations, Parts 560.203 and 560.204; and Title 18, United States Code, Section 2)

## FORFEITURE ALLEGATION

23. The violations alleged in Count One through Count Five of this Indictment are re-alleged and incorporated by reference herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

24. As a result of the offenses alleged in Count One through Count Five of this Indictment, defendants shall forfeit to the United States any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the offenses alleged in Count One through Count Five, including, but not limited to:

Money Judgment:

> a sum of money of at least $199,227.41, which represents a sum of money equal to property constituting, or derived from, proceeds obtained, directly or indirectly, as the result of the offenses alleged in Count One through Count Five of this Indictment.

25. By virtue of the commission of the felony offenses charged in Count One through Count Five of this Indictment, any and all interest that defendants have in property constituting, or derived from, proceeds obtained directly or indirectly, as the result of such offenses is vested in the United States and hereby forfeited to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

26. If, as a result of any act or omission of the defendants, the property identified above:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property that cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b)(1), incorporating by reference Title 21, United States Code, Section 853(p), to seek forfeiture of any

other property of the said defendants up to the value of said property listed above as being subject to forfeiture.

(**Criminal Forfeiture**, in violation of Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).)

A TRUE BILL

FOREPERSON

Attorney of the United States in
and for the District of Columbia